**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CRAIG MILLS, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:23-cv-280 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| MATTHEW CVITKOVICH, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

---

**ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART,
DEFENDANTS, MATTHEW CVITKOVICH'S AND CHIEF OF POLICE
CHRIS STUTES' MOTION FOR SUMMARY JUDGMENT (DOC. NO. 25)**

---

Presently before the Court is Defendants, Matthew Cvitkovich's and Chief of Police Chris Stutes' Motion for Summary Judgment (the "Motion") (Doc. No. 25). Plaintiff Craig Mills ("Mills") has brought this action against City of Xenia Police Officer Matthew Cvitkovich ("Officer Cvitkovich"), in his individual and official capacities, and City of Xenia Chief of Police Chris Stutes ("Chief Stutes"), in his individual and official capacities, (collectively, "Defendants") after being tased, pepper sprayed, and arrested by Officer Cvitkovich during a traffic stop and while Mills suffered from a diabetic incident. (*See* Doc. Nos. 1; 26.[1]) Mills alleges a number of civil rights violations related to his arrest—namely, excessive force—pursuant to 42 U.S.C. § 1983 and Ohio state law. (Doc. No. 1 at PageID 5-8.) Defendants assert Officer Cvitkovich's entitlement to immunity for the events in question here and refute the notion that the City of Xenia Police Department ("CXPD") has maintained an unconstitutional policy or custom which raises

---

[1] By Stipulation (Doc. No. 26), the Parties have agreed to dismiss Mills' claims against two law enforcement officers also involved in his arrest and the Greene County, Ohio Board of Commissioners.

1

an issue of municipal liability.

For the reasons set forth below, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendants, Matthew Cvitkovich's and Chief of Police Chris Stutes' Motion for Summary Judgment (Doc. No. 25).

## I.    **BACKGROUND[2]**

The events of this case begin with Mills experiencing a diabetic emergency, which left him incapacitated on the afternoon of October 1, 2022. (*See* Doc. No. 24 at PageID 114-20; *see also* Doc. No. 31 at PageID 357.)  Mills was diagnosed with diabetes at some point in 2019 and has been prescribed medication accordingly.  (Doc. No. 24 at PageID 115, 118.)  On October 1, 2022, a Saturday, Mills woke up, took his diabetes medication, and began running errands.  (*Id.* at PageID 114-15.)  While out and about, Mills picked up food to deliver to his elderly parents, who lived in a local long-term care facility.  (*Id.* at PageID 116-17.)  Purchasing this food would be Mills' last vivid memory of the day until after he encountered Officer Cvitkovich.  (*Id.* at PageID 117-18.)

Unbeknownst to him, Mills' blood sugar had dropped dramatically and he entered a sort of fugue state.  (*Id.*)  In his stupor, Mills was driving erratically, in a manner resembling intoxication. (*See* Doc. No. 25-1 at PageID 227.)  In particular, Mills was observed nearly running another vehicle off the road and sitting through several traffic light cycles.  (*Id.*)  CXPD received multiple calls reporting Mills' driving.  (*Id.*)  Mills came to his final stop at the corner of Lexington Avenue and North Columbus Street, in Greene County, Ohio.  (*Id.*)  While Mills, who was now incapacitated, was in his truck, a bystander reached through Mills' window to place the vehicle in park and remove the keys from the ignition.  (*Id.* at PageID 232.)

Shortly thereafter, Officer Cvitkovich arrived on the scene to address Mills' erratic driving.

---

[2] The Court refers directly to Defendants' exhibits by name where such exhibits have been manually filed.  Notice of Defendants' manual filings with the Court may be found at Doc. No. 33.

(*Id.* at PageID 227.) At the time, he believed he was responding to an individual under the influence of drugs and/or alcohol. (*Id.*) Upon locating Mills' truck, Officer Cvitkovich ran the vehicle's license plate and found that Mills had an up-to-date permit to carry a concealed weapon in the State of Ohio. (*Id.*)

When he approached, Officer Cvikovich found Mills slumped in the driver's seat of his truck with his right hand gripping the roll-pillar. (Defs. Ex., Bodycam, at 0:00-0:10.) Officer Cvitkovich began their interaction by informing Mills that CXPD had received numerous calls about his driving and invited Mills to explain why he was driving erratically. (*Id.* at 0:08-0:13.) Mills lethargically responded that he was trying to make his way home to Xenia. (*Id.* at 0:14-0:21.) Registering Mills' lethargy and apparent confusion as manifest intoxication, Officer Cvitkovich asked Mills how much alcohol he had to drink. (*Id.* at 0:27-0:29.) Mills appeared to not understand the question, and, slowly looked to his right and rolled his head backward as though he was having difficulty holding it up. (*Id.* at 0:29-41.) During this time, Mills' left hand was at his side in the truck cab and his right hand remained on the truck's roll-pillar. (*Id.*)

Officer Cvitkovich then asked Mills to step out of the vehicle. (*Id.* at 0:42-0:43.) Mills did not immediately respond to Officer Cvitkovich's request, but very slowly started opening his door to exit the vehicle after being asked a second time. (*Id.* at 0:43-0:53.) Once Mills got his door open, Officer Cvitkovich reached in to make sure the truck was in park and ordered Mills out of the vehicle. (*Id.* at 1:04-1:08.) Mills did attempt to get out of the vehicle, stabilizing his body on the roll-pillar and inching toward Officer Cvitkovich a single time. (*Id.* at 1:28-1:43.) Yet, Mills was unsuccessful. (*Id.* at 1:42-1:43.) Mills ultimately did more swaying in his seat and tensing of his body than anything else. (*Id.* at 1:43-1:48.) Officer Cvitkovich asked Mills if he needed a medic, to no avail. (*Id.* at 1:50-1:58.) Instead of answering, Mills turned his body such

3

that his left leg was out of the vehicle, gripped the roll-pillar, and made another attempt to pull himself out of the truck. (*Id.* at 1:59-2:16.) Mills was again unsuccessful in exiting the vehicle. (*Id.*)

With his body still facing Officer Cvitkovich, Mills proceeded to lean back and extend his right arm into the passenger seat of his tuck while he reached for the roll-pillar with his left hand. (*Id.* at 2:16-2:18.) This caused Officer Cvitkovich to be concerned because, based on his experience and training, individuals with concealed weapon permits tend to keep a firearm in the center console of their vehicles—near where Mills was extending his arm in this instance. (Doc. No. 25-1 at PageID 227.) Officer Cvitkovich instructed Mills not to reach around for anything in the vehicle and Mills complied, albeit lazily. (Defs. Ex., Bodycam, at 2:18-2:25.)

As he issued his instruction, Officer Cvitkovich came in closer to gain physical control of Mills, grabbing Mills' left arm and ordering him out of the truck once again. (*Id.*) Mills faintly said, "no," and dropped his head on his headrest. (*Id.* at 2:25-2:27.) Officer Cvitkovich advised Mills that staying in the vehicle was not an option. (*Id.* at 2:27-2:28.) Mills let out an unintelligible grunt, but made no other movements to get out of the truck. (*Id.* at 2:28-2:30.) Following a bit of back-and-forth, Officer Cvitkovich radioed for back-up to step up their response and placed another hand on Mills' left arm to prepare to forcibly remove him from the vehicle. (*Id.* at 2:30-2:36.) As Officer Cvitkovich pulled on Mills' arm, Mills retracted, clasped his hands at his stomach, and tensed up. (*Id.* at 2:37-2:44.) Officer Cvitkovich unholstered his police-issued taser gun[3] and warned that he would tase Mills if he did not get out of the truck. (*Id.* at 2:44-2:45.)

Three seconds after this warning, Officer Cvitkovich announced that Mills was under arrest and immediately fired his taser, striking Mills in the stomach. (*Id.* at 2:48-2:49.) Officer

---

[3] CXPD provided Officer Cvitkovich training on properly using means of force such as tasers and pepper spray in 2013. (*See* Doc. No. 25-1 at PageID 236.)

Cvitkovich continued to tase Mills from a short distance for about thirteen seconds, all the while shouting at Mills repeatedly to "get out of the car." (*Id.* at 2:49-3:02.) Mills, who was thrashing about, started trying to pull the taser prongs out of his stomach. (*Id.* at 2:52-3:02.) This prompted Officer Cvitkovich to come closer and attempt to perform a drive stun on Mills with the taser. (*Id.* at 3:02-3:03.) Mills swatted at Officer Cvitkovich and the officer backed up to briefly continue tasing Mills from a distance. (*Id.* at 3:03-3:04.) When Officer Cvitkovich came back in for another drive stun, he doubled his efforts by also pepper-spraying Mills in the eyes. (*Id.* at 3:04-3:06.) The pepper spray caused Mills to lurch backward such that he was lying across his center console and spilling over into the passenger seat of his truck. (*Id.* at 3:06-3:10.) Officer Cvitkovich tased Mills for another twenty-five seconds while yelling for Mills to get out of the vehicle. (*Id.* at 3:06-3:31.) Nearly one minute after first tasing Mills, Officer Cvitkovich reached into the truck and pulled Mills out by his arm. (*Id.* at 3:32-3:37.)

On the pavement, Mills was forced onto his stomach and Officer Cvitkovich struggled to handcuff him. (*Id.* at 3:37-3:58.) Despite multiple orders to place his hands behind his back, Mills only continued to groan and hold his face where he had been pepper-sprayed. (*Id.*) Additional officers arrived and began helping Officer Cvitkovich restrain Mills. (*Id.* at 3:58-4:08.) One officer assisted Officer Cvitkovich in maneuvering Mills' arms while another placed his knee on Mills' right shoulder blade in an effort to keep him still. (*Id.* at 4:08-4:46.) When the three officers finally got Mills handcuffed, they rolled him over on his side, noticing that his face was becoming discolored. (*Id.* at 5:00-5:06.) Believing that Mills was suffering from a drug overdose, Officer Cvitkovich requested that someone provide Narcan to stabilize him. (*Id.* at 5:08-5:10.) An officer administered Narcan to Mills and asked whether he had been drinking or taking drugs. (*Id.* at 6:40-7:07.) Mills eventually responded by shaking his head and groaning, "no." (*Id.* at 6:57-7:07.)

Mills has no recollection of these events.  (Doc. No. 24 at PageID 120-21.)  At his deposition, Mills testified that he could only remember feeling pain in his side where he was tased and burning in his eyes.  (*Id.* at PageID 121-23.)  Nonetheless, he did regain at least some semblance of lucidity by the time paramedics got to the scene.  (Defs. Ex., Bodycam, at 11:46-11:51.)  One paramedic asked Mills if he was diabetic and Mills responded affirmatively.  (*Id.*)

A medical assessment revealed Mills' drop in blood sugar, so Mills was transported to Greene Memorial Hospital rather than being taken into police custody.  (Doc. No. 25-1 at PageID 227.)  At the time, Mills also tested positive for COVID-19.  (Doc. No. 24 at PageID 124.)  For his part, Officer Cvitkovich went to the hospital to follow up with Mills.  (Doc. No. 25-1 at PageID 227.)  Mills, now alert and coherent, agreed to provide a urine sample to further demonstrate that he had not been under the influence of drugs or alcohol, but that he had suffered from a diabetic incident.  (Doc. No. 24 at PageID 125.)   Officer Cvitkovich issued Mills a citation for operating a vehicle while under the influence of drugs or alcohol ("OVI") and informed Mills that if his urinalysis came back negative the OVI charge would be dropped.  (Doc. No. 25-1 at PageID 227; *see also* Doc. No. 24 at PageID 126.)

The OVI charge against Mills would not be dismissed until three months later.  (Doc. No. 31-1 at PageID 372.)  In fairness, Mills' daughter has offered testimony that Mills' urinalysis results did not come back from lab testing until early December 2022.  The prosecutor and judge assigned to Mills' criminal case subsequently recused themselves and visiting officials were substituted in their place.  (*Id.*)  All told, the criminal OVI charge was dismissed in January of 2023.  (*Id.*)

In response to this entire incident, CXPD conducted an internal investigation into Officer Cvitkovich's use of force.  (*See* Doc. No. 25-2.)  On November 14, 2022, an investigating officer

submitted an internal memorandum finding that Officer Cvitkovich's use of force was sufficiently reasonable when confronting Mills on October 1. (*Id.* at PageID 240.) In support of this conclusion, the memorandum highlighted the fact that Mills possessed a concealed-carry permit, that Mills was generally noncompliant, and that—in the mind of the investigating officer—Mills had resisted arrest. (*Id.* at PageID 240-41.)

Mills filed this action on September 27, 2023. (Doc. No. 1.) In his Complaint with Jury Demand (the "Complaint") (Doc. No. 1), Mills has alleged claims for: excessive force, in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983 (Doc. No. 1 at PageID 5); municipal liability against CXPD by virtue of Officer Cvitkovich's use of force, pursuant to 42 U.S.C. 1983 (*id.* at PageID 6-7); assault and battery, pursuant to state law (*id.* at PageID 5-6); and, state law malicious prosecution (*id.* at PageID 7-8).

Defendants filed their current Motion on September 30, 2024. (Doc. No. 24.) Mills filed his response in opposition to the Motion on November 18, 2024 (Doc. No. 31), and Defendants submitted a reply brief on December 6, 2024 (Doc. No. 32). Consequently, Defendants' Motion is ripe for review and decision.

## II.     STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought" and that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, affidavits or sworn declarations, and

admissions on file, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(a), (c).

The burden then shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In opposing summary judgment, the nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. *Id.* at 248-49. It also is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must "go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

A party's failure "to properly address another party's assertion of fact as required by Rule 56(c)" can result in the court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Additionally, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 255. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Matsushita*, 475 U.S. at 587; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid

summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id*. The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id*.

### III. <u>ANALYSIS</u>

#### A. <u>Federal Claims</u>

To start, the Court will consider Mills' claims brought pursuant to 42 U.S.C. § 1983. (Doc. No. 1 at PageID 4-8.) Fundamentally, a claim under 42 U.S.C. § 1983 may only succeed where the plaintiff can demonstrate "that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Sample v. Bailey*, 409 F.3d 689, 695 (6th Cir. 2005) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001)) (alteration in original) (internal quotation marks omitted). Notably, § 1983 "does not create any substantive rights but rather merely provides remedies for deprivations of rights established elsewhere." *Id.* (citation and internal quotation marks omitted).

Mills' two federal claims can be articulated succinctly enough. First, Mills alleges that Officer Cvitkovich subjected him to excessive force on October 1, 2022, in violation of the Fourth Amendment of the United States Constitution. (Doc. No. 1 at PageID 5.) Second, Mills alleges that CXPD maintained an unconstitutional policy or custom which resulted in Officer Cvitkovich's use of excessive force. (*Id.* at PageID 6-7.) The Court tests these claims against Defendants' Motion in-kind.

#### 1. <u>Excessive force</u>

Regarding Mills' claim for excessive force, the Court must initially dismiss Chief Stutes, in his individual capacity. Mills makes no assertion anywhere in the record that Chief Stutes personally violated his constitutional rights. Rather, Chief Stutes was merely Officer Cvitkovich's

superior when the events of this case unfolded. 42 U.S.C. § 1983 does not provide for vicarious liability in this way. *Monell v. Dep't. of Soc. Servs. Of City of New York*, 436 U.S. 658, 692 (1978). Plaintiffs must be able to establish that the actions of a tortfeasor's superiors caused the alleged tort at issue. *Id.* As stated, Mills does not contend that Chief Stutes caused the constitutional violation alleged in this matter and the Court finds that he did not. Therefore, Defendants' Motion is **GRANTED** with respect to Chief Stutes, in his individual capacity.

Whether Officer Cvitkovich used excessive force, on the other hand, must be examined more closely. Mills has posited that Officer Cvkitkovich subjected him to excessive force: when he tased Mills; when he pepper-sprayed Mills; and, when he struggled with Mills on the ground after removing him from the vehicle. (Doc. No. 1 at PageID 5.) There is no dispute that Officer Cvitkovich was acting under the color of law when he took these actions. Instead, Defendants assert that Officer Cvitkovich is entitled to qualified immunity for his use of force on October 1, 2022. (Doc. No. 25 at PageID 205-09.)

Qualified immunity is a doctrine that shields state actors "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This doctrine serves to "hold public officials accountable when they exercise power irresponsibly," while protecting "officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. These principles have given way to a two-part inquiry, whereby courts must determine: "(1) whether the [state] action violated a constitutional right; and (2) 'whether that constitutional right was clearly established such that a reasonable official would understand that what he is doing violates that right.'" *Eldridge v. City of Warren*, 533 F. App'x. 529, 532 (6th Cir.

10

2013) (quoting *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 443-44 (6th Cir. 2012)) (internal quotation marks omitted).  If, viewing the facts in the light most favorable to the plaintiff, either of these two prongs cannot be established, the defendant is entitled to qualified immunity. *Mitchell v. Schlabach*, 864 F.3d 416, 420 (6th Cir. 2017) ("Government officials are protected by the doctrine of qualified immunity unless the answer to both questions is yes").  Once a defendant has invoked qualified immunity, "'the ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity.'"  *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)).

In their plea for qualified immunity, Defendants primarily argue that Officer Cvitkovich's use of force did not amount to a constitutional violation.  (*See* Doc. No. 25 at PageID 205-09.) They do state off-hand that Mills has not pointed to any clearly established right which would overcome Officer Cvitkovitch's claim to qualified immunity (*id.* at PageID 208), but the lion's share of Defendants' Motion rests on the notion that Officer Cvitkovich's use of force in this case was wholly reasonable and, therefore, not violative of the Constitution. (*Id.* at PageID 208-09.)  In particular, Defendants submit that Officer Cvitkovitch used force when confronting Mills because Mills was incapable of making rational decisions, Mills posed an immediate threat by virtue of his concealed-carry permit, and Mills actively resisted arrest.  (*Id.*)  Mills responds broadly arguing the opposite; that Officer Cvitkovitch's application of force against him was unreasonable.  (Doc. No. 31 at PageID 363-66.)

Generally, courts look to the Fourth Amendment when determining whether a law enforcement officer has subjected a person to excessive force.  *See e.g.*, *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also Palma*, 27 F.4th at 428 (quoting *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).  The Fourth Amendment protects individuals from *unreasonable* searches

and seizures. U.S. CONST. AMEND. IV. In keeping with this stricture, an officer's application of force will run afoul of the Constitution if their use of force was objectively unreasonable. *Stewart v. City of Euclid*, 970 F.3d 667, 672 (6th Cir. 2020) ("Thus, to be constitutional, [the use of force] must be reasonable").

In considering the objective reasonableness of an officer's use of force, reviewing courts typically look to "the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officer[] or others, and whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 390 U.S. at 396) (internal quotation marks omitted). These factors must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Kent*, 810 F.3d at 390 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015)) (internal quotation marks omitted). Importantly, however, courts may not consider the reasonableness of an officer's use of force in the aggregate when he utilized multiple applications of force in a single instance. *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Smith v. City of Troy*, 874 F.3d 938, 944 (6th Cir. 2017)). When "a plaintiff claims that excessive force was used multiple times, 'the court must segment the incident into its constituent parts and consider the officer's entitlement to qualified immunity at each step along the way.'" *Id.*

In the instant case then, the Court must determine Officer Cvitkovich's entitlement to qualified immunity for each of the three distinct applications of force highlighted above, separately.[4]

### i.  **Use of Taser**

---

[4] The Court notes that, because Defendants argue for qualified immunity in the aggregate, their assertions regarding qualified immunity are largely the same for each of Officer Cvitkovitch's applications of force.

The Court turns first to Officer Cvitkovich's decision to tase Mills on October 1, 2022. Regarding the first *Graham* factor—the severity of the crime at issue—Officer Cvitkovich approached Mills with probable cause to believe that Mills had been driving while under the influence of drugs and/or alcohol. (Doc. No. 25-1 at PageID 227.) By contrast, Officer Cvitkovich had no reason to adduce that he was responding to a medical emergency.

As a crime, the Sixth Circuit has found that driving under the influence of drugs and/or alcohol is not "categorically severe." *Eldridge*, 533 F. App'x. at 532 (citation and internal quotation marks omitted). Here, there are few facts that would have rendered Mills' crime particularly severe if he were driving under the influence. At most, Mills drove all over the road, but he did not exhibit any outward hostility, aggression, or purposefulness in doing so. Indeed, when Officer Cvitkovich approached Mills, he did not immediately place Mills under arrest. Mills had come to a complete stop and Officer Cvitkovich took a gentle tact initially. Thus, the Court finds that the severity of the crime Officer Cvitkovich was investigating in this case was not particularly severe.

Looking to the second *Graham* factor—the threat posed by the suspect—Defendants argue that Mills posed a serious threat to Officer Cvitkovich by extension of his concealed-carry permit. (Doc. No. 25 at PageID 208-09.) Officer Cvitkovitch, relying on his training and experience, suspected that because Mills had a concealed-carry permit, it was likely that he had a firearm in his vehicle. (Doc. No. 25-1 at PageID 227.) The Sixth Circuit's reasoning in *Landis v. Baker*, 297 F. App'x. 453, 461 (6th Cir. 2008), is instructive on this point. That case did not concern a suspect with a valid permit to carry a concealed weapon. However, in *Landis*, the Sixth Circuit found that the plaintiff did not pose a serious threat to the defendant officers, noting that the plaintiff "was moving lethargically and appeared to be unaware of his surroundings." *Id.*

13

The same is also true in the matter at hand. Officer Cvitkovitch was certainly justified in his suspicion that Mills might have a weapon in the vehicle. Nevertheless, Officer Cvitkovich did not know for a fact that Mills had a gun in his vehicle, in the center console in particular. For all-intents-and-purposes, the firearm later found in Mills' center console (Doc. No. 25-1 at PageID 227), was neither here nor there when Officer Cvitkovich first approached Mills. Moreover, even in light of Officer Cvitkovich's reasonable suspicion, it would have been unreasonable to assume that Mills actually posed a threat. Officer Cvitkovich himself acknowledged Mills lethargy, disorientation, and difficulty moving and speaking. (Defs. Ex., Bodycam, at 7:25-7:34; *see also* Doc. No. 25-1 at PageID 227.) Viewing these facts in Mills' favor, a reasonable jury could determine that Mills was physically incapable of posing any real risk of harm to Officer Cvitkovich. Hence, the Court finds that the second *Graham* factor weighs against finding Officer Cvitkovich's taser use reasonable.

Third, Defendants contend that the third *Graham* factor—whether the suspect actively resisted arrest—weighs in Officer Cvitkovich's favor. (Doc. No. 25 at PageID 209.) As a rule, courts have drawn a distinction between active resistance and passive resistance when applying the third *Graham* factor. *Eldridge*, 533 F. App'x. at 535 (quoting *Coles v. Eagle*, 704 F.3d 624, 629-30 (9th Cir. 2012)). Passive resistance will not suffice to justify an officer's use of force. *Smith*, 874 F.3d at 945 ("It was well established at the time of the incident in this case that a non-violent, non-resisting, *or only passively resisting* suspect who is not under arrest has a right to be free from excessive force" (*emphasis added*)). To be sure, the Sixth Circuit has "often found that the reasonableness of an officer's use of force turns on active resistance …." *Kent*, 810 F.3d at 392 (citing *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015)); *see also Wright*, 962 F.3d at

14

867 (citing *Goodwin*, 781 F.3d at 323) ("if the resistance was merely 'passive,' then the use of a taser was unreasonable").

Active resistance by a suspect requires "some outward manifestation—either verbal or physical—on the part of the suspect" suggesting "volitional and conscious defiance." *Eldridge*, 533 F. App'x. at 534. Further, the outward manifestation must typically include a confluence of potential actions such as "'physically struggling with, threatening, or disobeying officers.'" *Kent*, 810 F.3d at 392 (quoting *Rudlaff*, 791 F.3d at 641). However, simple noncompliance will not constitute active resistance. *Kent*, 810 F.3d at 393-94 (citing *Goodwin*, 781 F.3d at 325-26). Rather, noncompliance must be "paired with [] signs of verbal hostility or physical resistance." *Eldridge*, 533 F. App'x. at 535.

At bar, the Court finds an issue of material fact regarding whether Mills engaged in active resistance to justify Officer Cvitkovitch's use of a taser. First and foremost, Mills was technically under arrest for less than a second when Officer Cvitkovich tased him. Although Officer Cvitkovich gave Mills a three second warning, he fired his taser immediately upon informing Mills that he was under arrest. Up to that point, Mills had been noncompliant with the order to exit his vehicle. But he was not under arrest and he was given no real opportunity to comply after being placed under arrest.

Moreover, Mills had showed Officer Cvitkovich no meaningful outward signs of defiance or aggression prior to being tased. Twice, Mills attempted to inch himself out of his truck when ordered, to no avail. Mills did finally respond to Officer Cvitkovitch's demand by saying "no." Though, not only was Mills not under arrest at that time, but after having tried to get out of his truck twice, a reasonable jury viewing the facts in Mills' favor could conclude that Mills' "no" was more a statement of his ability to get out of the car than his willingness to. Mills' most active

15

resistance at this juncture came when he tensed up just before being tased by Officer Cvitkovich. Yet, on summary judgment, this resistance was minimal at best, and, the Court finds that it did not rise to the level of active resistance. *See Smith*, 874 F.3d at 945.

To the extent that Defendants argue that Officer Cvitkovich's continued tasing of Mills was reasonable due to Mills' noncompliance, the Court is similarly unconvinced at this stage. As he tased Mills, Officer Cvitkovich repeatedly shouted for Mills to get out of the car. This is counterintuitive on its face. The entire purpose and effect of taser use is to immobilize the target. *See Foos v. City of Delaware*, 492 F. App'x. 582, 588 (6th Cir. 2012). A reasonable officer would have known that they could not hold a suspect's failure to move against him while he was being tased because a taser is meant to prevent a target from moving in the first place. On balance, the Court appreciates that Mills was trying to pull Officer Cvitkovich's taser prongs out of his stomach. However, Mills seemed to be resisting pain more than resisting arrest. Based on the surrounding circumstances, the Court cannot definitively say whether Mills' response to being tased constituted active resistance. Thus, the Court finds an issue of material fact to be presented to a jury in this regard.

In sum, viewing the record in the light most favorable to Mills, the Court finds that a jury could plausibly determine Officer Cvitkovich's use of a taser to subdue Mills to be unreasonable. Additionally, without more than a cursory argument from Defendants, the Court finds that Mills had a clearly established "right to be free from the use of physical force when he [was] not resisting police efforts to apprehend him." *Eldridge*, 533 F. App'x. at 535. Therefore, there is a genuine issue of material fact regarding Officer Cvitkovich's entitlement to qualified immunity for tasing Mills, and, the Court **DENIES** Defendants' Motion accordingly.

## ii.   Use of Pepper Spray

Officer Cvitkovich's decision to pepper-spray Mills requires a slightly different calculus. The Court's consideration of the first two *Graham* factors is unchanged for this application of force.  However, the contention that Mills was actively resisting arrest when Officer Cvitkovich chose to pepper spray him carries more water.

By the time Officer Cvitkovich pepper-sprayed Mills, Mills was thrashing about from the taser and was using what mobility he had to attempt to remove the taser prongs from his stomach. Even assuming that Mills was not resisting arrest, but instead resisting pain, a reasonable officer who just arrived on the scene would have undoubtably deduced that Mills was resisting arrest.  By one token, the use of pepper spray will be considered excessive force "when a detainee has surrendered, is secured, is not acting violently and does not pose a threat to officers or anyone else." *Grawey v. Drury*, 567 F.3d 302, 310-11 (6th Cir. 2009) (citing *Cabaniss v. City of Riverside*, 231 F. App'x. 407, 413 (6th Cir. 2007)).  Key here, Mills was actually under arrest when Officer Cvitkovich pepper-sprayed him.  Knowing only that Officer Cvitkovich was attempting to affect a lawful arrest, a reasonable officer unacquainted with Officer Cvitkovich's subjective experience would have considered Mills to be unsecured and technically still at-large, even if not decidedly violent or dangerous.

In short, based on the totality of the circumstances, Officer Cvitkovitch decided to make an arrest and by the time he used his pepper spray, he reasonably needed to use some degree of force to affect it.  Given that, Officer Cvitkovitch only pepper-sprayed Mills enough to neutralize him.  Accordingly, the Court finds that Officer Cvitkovich is entitled to qualified immunity for his use of pepper spray in this case, and, Defendants' Motion is **GRANTED** along these lines.

### iii.     Physical Struggle to Handcuff Mills

17

The final use of force at issue here takes the form of Officer Cvitkovich's struggle to handcuff Mills. Mills characterizes this physical struggle as a "beating." (Doc. No. 31 at PageID 369.) However, from the perspective of Officer Cvitkovich's body camera, the Court can only see that Officer Cvitkovich removed Mills from his truck, placed Mills on the ground, and handcuffed him. Officer Cvitkovich only exerted enough force to affect a lawful arrest and then proceeded to roll Mills over and await medical personnel to care for him. All other acts of purported force in this situation were committed by other officers; officers whom Mills has voluntarily dismissed from this action (Doc. No. 26). Thus, the Court **GRANTS** Defendants' Motion in this regard.

### 2. Municipal Liability

To book-end Mills' claims alleged under federal law, the Court must consider whether CXPD may be held liable—through Chief Stutes, in his official capacity—for Officer Cvitkovich's taser use. Defendants contend that, even if Officer Cvitkovich's use of force in this case was unreasonable, Mills cannot prove a municipal policy or custom which caused a violation of his constitutional rights, as contemplated for municipal liability under 42 U.S.C. § 1983. (Doc. No. 25 at PageID 210-13.) In his Complaint, Mills has alleged several theories of municipal liability against CXPD for maintaining unconstitutional policies and/or customs. (Doc. No. 1 at PageID 7.) Mills reiterates these theories of municipal liability in response to Defendants' Motion. (Doc. No. 31 at PageID 368.) Although, Mills has yet to offer evidence of CXPD's unconstitutional customs or policies. While Mills does take issue with Defendants' evidence, at the summary judgment stage, Mills has essentially restated the allegations of his Complaint.

The Supreme Court set the baseline for when municipalities may be held liable for constitutional violations committed by municipal employees in *Monell*. 436 U.S. at 694-95. In *Monell*, the Supreme Court stated:

> that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694.  Courts have interpreted this standard to allow for claims against municipalities under § 1983 by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

To those ends, the Court finds that Mills has failed to raise an issue of material fact regarding CXPD's liability.  Mills points out that Officer Cvkitvoch completed his last training module on taser-usage in 2013.  (Doc. No. 31 at PageID 369.)  That Officer Cvitkovich may not have been trained recently does not mean that he received inadequate training *per se*.  Mills also offers the opinion of Dr. Michael D. Lyman, a purported expert in matters of law enforcement training.  (*See* Doc. No. 31-2.)  However, Dr. Lyman has provided more legal conclusions than factual analysis, and, the Court must disregard his report accordingly.  Otherwise, Mills makes little effort to establish a genuine issue of material fact related to municipal liability.  In total, Defendants have lodged evidence of Officer Cvitkovich's training and CXPD policy, while Mills basically rests on the allegations made in his Complaint.  Even viewing the facts in Mills' favor, without evidence to support his claim, the Court finds that Mills cannot establish municipal liability against CXPD under 42 U.S.C. § 1983.  Hence, the Court **GRANTS** Defendants' Motion insofar as the Motion seeks summary judgment on the issue of municipal liability.

**B.  <u>State Law Claims</u>**

19

The Court lastly pivots to Mills two civil rights claims alleged pursuant to state law.  Under Ohio law, Mills has alleged that Officer Cvitkovich is liable for assault and battery in relation to his use of excessive force, and, Mills has alleged that the City of Xenia is liable for maliciously prosecuting him.  (Doc. No. 1 at PageID 6-8.)  Defendants' Motion takes aim at both claims and the Court considers each state law claim in turn.

### 1.  <u>Assault and Battery</u>

In Ohio, police officers enjoy broad statutory immunity from suit unless the officer has acted outside the scope of his duties or inflicted injury "with malicious purpose, in bad faith, or in a wanton or reckless manner."  Ohio Rev. Code § 2744.03(A)(6).  When a defendant has asserted qualified immunity under federal claims, the defendant's claim to statutory immunity will "stand[] or fall[] with their federal qualified immunity defense."  *Hopper v. Phil Plummer*, 887 F.3d 744, 760 (6th Cir. 2018) (citation omitted).  Here, this principle requires that the Court deny Officer Cvkitkovich's claim to statutory immunity as applied to his taser-usage.  On the other hand, the Court finds that Officer Cvitkovich is entitled to statutory immunity in all other respects.  To be sure, Mills does not make any argument regarding statutory immunity under state law.  Consequently, the Court **DENIES** Defendants' Motion on Mills' state law claim for assault and battery only to the extent that claim relates to Officer Cvitkovich's taser-usage.  Otherwise, Officer Cvitkovich is entitled to statutory immunity on Mills' assault and battery claim.

### 2.  <u>Malicious Prosecution</u>

The Court finds that Mills' claim for malicious prosecution fails outright.  To reiterate, Mills' malicious prosecution claim has been lodged against the City of Xenia rather than any City official.  (Doc No. 1 at PageID 7-8.)  Defendants suggest that the City of Xenia is entitled political subdivision immunity, as set forth in Ohio statute.  (Doc. No. 25 at PageID 218.)  Mills again fails

to address Defendants' argument for statutory immunity, but does seem to insinuate that the prosecutor and judge originally assigned to Mills' OVI case took too long to dismiss the criminal charge against him.  (Doc. No. 31 at PageID 370.)

Ohio law provides that, subject to exceptions, "a political subdivision is not liable … in a civil action …" for "any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."  Ohio Rev. Code § 2744.02(A)(1).  Per statute, a governmental function is pertinently defined as a "judicial, quasi-judicial, prosecutorial, legislative, and quasi-legislative function[]."  Ohio Rev. Code. § 2744.01(C)(2)(f).  There is no dispute that the City of Xenia is a political subdivision in Ohio, nor that the prosecutor and judge involved in Mills' criminal case were not performing governmental functions.  Moreover, Mills does not point to an applicable statutory exception that would make his state law claims against the City of Xenia viable and the Court can find none.  Thus, the Court must **GRANT** Defendants' Motion on Mills' claim for malicious prosecution under Ohio law.

## IV. <u>CONCLUSION</u>

Based on the foregoing, the Court **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Defendants Matthew Cvitkovich's and Chief of Police Chris Stutes' Motion for Summary Judgment (Doc. No. 25).  Defendants' Motion is **DENIED** with respect to Mills' federal claim for excessive force and his state law claim for assault and battery, only to the extent that those claims pertain to Officer Cvitkovich's use of a taser to subdue Mills.  Defendants' Motion is **GRANTED** in all other respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, December 30, 2024.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

21